NOT YET SCHEDULED FOR ORAL ARGUMENT

## No. 18-5116

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————

Citizens for Responsibility and Ethics in Washington

*Plaintiff–Appellant*

v.

United States Department of Justice

*Defendant–Appellee*

—————————

On appeal from the United States District Court for the
District of Columbia — No. 1:16-CV-01068 (Jackson, J.)

## BRIEF OF *AMICI CURIAE* THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AND CAMPAIGN FOR ACCOUNTABILITY, IN SUPPORT OF APPELLANT AND REVERSAL

Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
alex.abdo@knightcolumbia.org

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Amici certify as follows:

**A.    Parties and Amici.**

All parties, intervenors, and amici appearing before the district court and this Court are listed in the Brief of Appellant, except for the following amici: the Knight First Amendment Institute at Columbia University and Campaign for Accountability.

**B.    Rulings Under Review.**

References to the ruling at issue appear in the Brief of Appellant. The ruling appears at Joint Appendix 23–31, and it is reported at *Citizens for Responsibility & Ethics in Washington v. Department of Justice*, 298 F. Supp. 3d 151 (D.D.C. 2018).

**C.    Related Cases.**

Counsel are not aware of any prior or related cases other than those noted in the Brief of Appellant. Amici submitting this brief are the party and counsel litigating the related case of *Campaign for Accountability v. Department of Justice*, No. 1:16-CV-01068-KBJ (D.D.C.) (Jackson, J.).

## CORPORATE DISCLOSURE STATEMENT

The Knight First Amendment Institute at Columbia University and Campaign for Accountability have no parent companies, and no publicly held corporation has a ten percent or greater ownership interest in either of the amici.

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute aims to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

Campaign for Accountability ("CfA") is a non-partisan, non-profit section 501(c)(3) organization committed to promoting government transparency, educating the public about government activities, and ensuring the accountability of government officials. Through research, FOIA requests, and litigation, CfA uses the information it gathers, and its analysis of it, to educate the public about the activities and operations of both federal and state government through reports, published analyses, press releases, and other media. The organization is incorporated under the laws of the District of Columbia.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iii

GLOSSARY ................................................................................ v

INTERESTS OF *AMICI CURIAE* ..................................................... 1

RELEVANT STATUTES ................................................................ 2

SUMMARY OF ARGUMENT .......................................................... 3

ARGUMENT ............................................................................. 5

I.   The OLC'S "formal written opinions" generally constitute
     "working law" and must be proactively processed under FOIA's
     reading-room provision. ...................................................... 5

     A.   Under the "working law" doctrine, an agency must
          proactively process records that have "the force and effect of
          law." ...................................................................... 6

     B.   The OLC's formal written opinions have the force and effect
          of law. .................................................................. 10

          1.   They are binding. ................................................ 10

          2.   They form a system of precedent. ............................. 13

          3.   They flow downward. ........................................... 15

          4.   They are solicited and issued to guide future agency
               conduct. .......................................................... 17

          5.   They are written in conclusive terms. ........................ 18

     C.   The Court's decision in *EFF* is not to the contrary, because
          the OLC memorandum at issue in that case was backward-
          looking and offered policy advice on a retrospective
          investigation. .......................................................... 19

D.      The OLC's formal written opinions are generally not exempt from disclosure pursuant to the attorney–client privilege. ........... 23

II.     Even under a broad reading of *EFF*, certain subcategories of the OLC's formal written opinions are working law because they determine agency policy. ........................................................ 25

CONCLUSION ................................................................................ 26

RULE 32(G)(1) CERTIFICATE ........................................................ 28

CERTIFICATE OF SERVICE ............................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Campaign for Accountability v. Dep't of Justice*,
   278 F. Supp. 3d 303 (D.D.C. 2017)............................................................. 2, 25

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*
   (*CREW*),
   298 F. Supp. 3d 151 (D.D.C. 2018)................................................19, 21, 23, 25

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980)....................................................4, 7, 8, 15, 17

*Elec. Frontier Found. v. Dep't of Justice* (*EFF*),
   739 F.3d 1 (D.C. Cir. 2014)...............................................2, 4, 20, 21, 22, 23, 26

*In re Subpoenas Duces Tecum*,
   738 F.2d 1367 (D.C. Cir. 1984) ............................................................... 24

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ................................................................................ 5

*Schlefer v. United States*,
   702 F.2d 233 (D.C. Cir. 1983)........................................................3, 6, 13, 19

*Tax Analysts v. IRS* (*Tax Analysts I*),
   117 F.3d 607 (D.C. Cir. 1997)....................................... 3, 7, 8, 9, 15, 17, 22, 23

*Tax Analysts v. IRS* (*Tax Analysts II*),
   294 F.3d 71 (D.C. Cir. 2002)........................................................4, 9, 10, 15, 19

## Statutes

28 U.S.C. § 512 ................................................................................... 10

5 U.S.C. § 552 .................................................................................. v, 3

## Other Authorities

Daphna Renan, *The Law Presidents Make*, 103 Va. L. Rev. 805
   (2017)...................................................................11, 12, 13, 16, 22

*Homeland Security Secretary 'Fully Confident' in Legality of Obama's Immigration Action*, PBS NewsHour (Nov. 24, 2014, 6:35 PM), http://www.pbs.org/newshour/bb/homeland-security-secretary-fully-confident-legality-obamas-immigration-action [https://perma.cc/4MSL-2C6Q] ................................................................. 5, 16

Jack Goldsmith, The Terror Presidency: Law and Judgment Inside the Bush Administration (2007) ........................................................... 16

John O. McGinnis, *Models of the Opinion Function of the Attorney General*, 15 Cardozo L. Rev. 375 (1993) ..................................... 6, 12

Memorandum from David J. Barron, Acting Assistant Att'y Gen., to Att'ys of the Office of Legal Counsel, *Re: Best Practices for OLC Legal Advice and Written Opinions* (July 16, 2010) 4, 12, 13, 14, 15, 16, 17, 24, 25

Memorandum from Steven Bradbury, Principal Deputy Assistant Att'y Gen., to Att'ys of the Office of Legal Counsel (May 16, 2005), https://www.justice.gov/sites/default/files/pages/attachments/2014/07/11/olc-best-practices-2005.pdf [https://perma.cc/GNU6-DKKU] ..................................................... 12

Nelson Lund, *Rational Choice at the Office of Legal Counsel*, 15 Cardozo L. Rev. 437 (1993) ............................................................. 12

Office and Duties of the Attorney General, 6 Op. Att'y Gen. 326 (1854)........................................................................................... 11

OLC Response Letter, *Campaign for Accountability v. Dep't of Justice*, No. 1:16-CV-01068-KBJ (D.D.C. Jan. 2, 2018), ECF No. 27-1 ................................................................................................ 12

Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303 (2000) ............................................................................... 12, 13

Trevor Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448 (2010) ...............................................12, 13, 14

# GLOSSARY

| | |
|---|---|
| CREW | Citizens for Responsibility and Ethics in Washington |
| FOIA | Freedom of Information Act, 5 U.S.C. § 552 |
| FSAs | Field Service Advice Memoranda of the Office of Chief Counsel of the Department of the Treasury |
| IRS | Internal Revenue Service |
| OLC | Office of Legal Counsel, U.S. Department of Justice |

## INTERESTS OF *AMICI CURIAE*

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute aims to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. The Institute's staff has extensive experience litigating Freedom of Information Act lawsuits, including lawsuits pertaining to the formal written opinions of the Office of Legal Counsel.

Campaign for Accountability ("CfA") is a non-partisan, non-profit section 501(c)(3) organization committed to promoting government transparency, educating the public about government activities, and ensuring the accountability of government officials. Through research, FOIA requests, and litigation, CfA uses the information it gathers, and its analysis of it, to educate the public about the activities and operations of both federal and state government through reports, published analyses, press releases, and other media. The organization is incorporated under the laws of the District of Columbia. CfA has extensive experience seeking records from numerous federal and state agencies and litigating to enforce its rights to those records.

CfA, represented by the Knight First Amendment Institute, has been litigating a case related to this appeal for the last two years: *Campaign for Accountability v. Department of Justice*, No. 1:16-CV-01068-KBJ (D.D.C.) (Jackson, J.). That case, like this one, seeks to establish that the Office of Legal Counsel's formal written opinions generally constitute working law that must be proactively processed pursuant to the reading-room provision of the Freedom of Information Act. Also as in this case, the district court in *Campaign for Accountability* granted the government's motion to dismiss based on an expansive interpretation of this Court's decision in *Electronic Frontier Foundation v. Department of Justice* (*EFF*), 739 F.3d 1 (D.C. Cir. 2014). *See Campaign for Accountability v. Dep't of Justice*, 278 F. Supp. 3d 303 (D.D.C. 2017).

CfA amended its complaint in response to the dismissal, identifying four subcategories of the Office of Legal Counsel's formal written opinions that would constitute working law even under the district court's expansive interpretation of *EFF*. The government filed a renewed motion to dismiss, oral argument on that motion was heard on July 20, 2018, and the motion remains pending.[1]

## RELEVANT STATUTES

All applicable statutes are set forth in the Brief of Appellant.

---

[1] All parties have consented to the filing of this brief. No party, party's counsel, or individual other than the amici and its counsel authored any portion of this brief or contributed money toward its preparation.

## SUMMARY OF ARGUMENT

This lawsuit, brought by Citizens for Responsibility and Ethics in Washington ("CREW"), challenges the practice of the Office of Legal Counsel ("OLC") of treating its formal written opinions as categorically exempt from the reading-room provision of the Freedom of Information Act ("FOIA"). *See* 5 U.S.C. § 552(a)(2)(A)–(B). As interpreted by the Supreme Court and this Court, the reading-room provision requires agencies to proactively process under FOIA records that have "the force and effect of law"—that is, their "working law." Amici file this brief to highlight the statements and practice of the executive branch, and the historical research and scholarship, that together make clear that the OLC's formal written opinions, when issued to federal agencies and officials other than the president, bear all the characteristics of working law.

The OLC's formal written opinions have five features that collectively give these opinions the character of working law. First, the OLC's formal written opinions are *binding*, as they are "written and received in circumstances that establish them as definitive rulings on the legal questions they decide." *Schlefer v. United States*, 702 F.2d 233, 237 (D.C. Cir. 1983). Second, the OLC's formal written opinions form a *system of precedent*, in that they are issued "to develop a body of coherent, consistent interpretations" across the executive branch as a whole. *Tax Analysts v. IRS* (*Tax Analysts I*), 117 F.3d 607, 617 (D.C. Cir. 1997).

Third, the OLC's formal written opinions *flow downward*, from the body charged with interpreting the law to those charged with implementing it. *See Tax Analysts v. IRS* (*Tax Analysts II*), 294 F.3d 71, 81 (D.C. Cir. 2002). Indeed, with respect to every federal official, save the attorney general and the president, the OLC's authority to interpret the law is superseding. Fourth, unlike the opinion at issue in *Electronic Frontier Foundation v. Department of Justice* (*EFF*), 739 F.3d 1 (D.C. Cir. 2014), the OLC's formal written opinions are generally *forward-looking*. Rather than "opin[e] on the legality of past conduct," JA 19,[2] the typical formal written opinion is solicited and issued to "guide and direct future conduct," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980). Fifth, and finally, the OLC's formal written opinions are written in *conclusive terms*. *See Tax Analysts II*, 294 F.3d at 81. Unlike legal advice, they do not assess legal risk in equivocal terms; rather, they resolve legal disputes in conclusive, mandatory terms.

These characteristics demonstrate that the OLC, when issuing formal written opinions, functions not as an attorney confidentially advising a client but as an arbiter. The OLC is, as the former Secretary of the Department of Homeland Security once said, "the Supreme Court of the executive branch."[3]

---

[2] Memorandum from David J. Barron, Acting Assistant Att'y Gen., to Att'ys of the Office of Legal Counsel, *Re: Best Practices for OLC Legal Advice and Written Opinions* 3 (July 16, 2010) [hereinafter Barron Memo].

[3] *Homeland Security Secretary 'Fully Confident' in Legality of Obama's Immigration Action*, PBS NewsHour (Nov. 24, 2014, 6:35 PM),

4

For good reason, FOIA requires that the OLC proactively process its formal written opinions for release to the public. These opinions have an operative effect within government nearly indistinguishable from the opinions of the federal courts. They are the law of the land, expressed in quasi-judicial proclamations that bind federal agencies, that insulate federal officials from criminal liability, and that determine the rights of the public. Kept largely secret, however, the OLC's formal written opinions have become the shadow law of our democracy. They are precisely the sort of "secret law" Congress enacted FOIA to eliminate. The OLC's formal written opinions ought presumptively to be made public.

## ARGUMENT

I.    **The OLC'S "formal written opinions" generally constitute "working law" and must be proactively processed under FOIA's reading-room provision.**

Since the Supreme Court's decision in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975), this Court has interpreted FOIA's reading-room provision to require that agencies disclose records that have the "force and effect of law"—that is, their "working law." In enacting the reading-room provision, Congress recognized that agencies have no legitimate interest in concealing the final legal

---

http://www.pbs.org/newshour/bb/homeland-security-secretary-fully-confident-legality-obamas-immigration-action [https://perma.cc/4MSL-2C6Q] (quoting Jeh Johnson, Secretary of the Department of Homeland Security).

determinations that control agency conduct or that articulate the scope of

individual rights. The OLC's formal written opinions reflect precisely these kinds

of legal determinations, "compris[ing] the largest body of official interpretation of

the Constitution and statutes outside the volumes of the federal court reporters."[4]

While the working-law doctrine is fact-sensitive, the OLC's formal written

opinions generally exhibit the key characteristics of working law.

A.     **Under the "working law" doctrine, an agency must proactively
       process records that have "the force and effect of law."**

In distinguishing working law from deliberative or confidential legal advice,

this Court, following the Supreme Court, has taken a functional approach,

"look[ing] beneath formal lines of authority to the reality of the decisionmaking

process in question." *Schlefer*, 702 F.2d at 238. The Court has identified records

that have the "force and effect of law" by focusing on five characteristics: (1)

whether the records are binding; (2) whether the records form a system of

precedent; (3) whether the records flow downward; (4) whether the records are

solicited and issued to govern future conduct; and (5) whether the records are

written in conclusive terms. Guided by these factors, this Court has emphasized on

multiple occasions that agencies must disclose final legal interpretations *even if*

---

[4] John O. McGinnis, *Models of the Opinion Function of the Attorney General*,
15 Cardozo L. Rev. 375, 376 (1993) (OLC attorney–advisor from 1985 to 1987
and Deputy Assistant Attorney General from 1987 to 1991).

*they do not dictate any specific policy decision*. Further, circuit precedent makes clear that "[t]he government's opinion about what is *not* the law and why it is not the law is as much a statement of government policy as its opinion about what the law is." *Tax Analysts I*, 117 F.3d at 617 (emphasis added).

*Coastal States* is illustrative. In that case, this Court held that legal opinions issued by the Department of Energy's regional counsel to auditors in its field offices constituted working law. 617 F.2d at 858. Auditors, whose job it was to assure compliance with Department regulations, would solicit legal opinions from the regional counsel on how the regulations applied to particular facts—facts that could be "either real or hypothetical." *Id.* at 858–59. In response, the regional counsel would "interpret[] any applicable regulations in light of those facts, and often point[] out additional factors which might make a difference in the application of the regulation." *Id.* at 859. Although the opinions that the regional counsel issued were not "formal" or "binding," *id.*, "the advice was regularly and consistently followed," *id.* at 860. Moreover, the opinions were "indexed by subject matter," "used as precedent in later cases," "amended" or "rescinded" as appropriate, and on "at least one occasion . . . cited to a member of the public as binding precedent." *Id.* Based on these observations, this Court concluded that the opinions in *Coastal States* amounted to working law, analogous "to trial court decisions in that . . . they ha[d] operative and controlling effect over auditors." *Id.*

at 867. It also rejected the Department's argument that the interpretations were predecisional in any meaningful sense, even though they were part of "an ongoing audit process," because any "give-and-take" over the questions presented ended as soon as the memoranda had been issued. *Id.* at 868. In sum, the Court found that the opinions at issue constituted working law even though they were not formally binding, could address hypothetical scenarios, and left it to their recipients to actually apply the legal interpretations they contained.

In *Tax Analysts I*, this Court took a similar approach in holding that the Internal Revenue Service's so-called "Field Service Advice Memoranda" (FSAs) must be disclosed. *Tax Analysts I*, 117 F.3d at 617. The Office of Chief Counsel issued the memos in response to requests by IRS field personnel for guidance, "usually with reference to the situation of a specific taxpayer." *Id.* at 609. Though "not formally binding," the memos "[were] held in high regard and [were] generally followed." *Id.* The Court's analysis mirrored its earlier analysis in *Coastal States*, *see id.* at 617–18, but two points bear emphasis. First, the Court held that the FSAs "constitute agency law, even if those conclusions are not formally binding," in part because the memoranda were issued in an effort "to develop a body of coherent, consistent interpretations of the federal tax laws nationwide." *Id.* at 617. Second, the Court held that the memoranda's legal interpretations were "agency law" even though they did not direct—and might

8

even conflict with—the requesting personnel's policy determinations. *Id.* On this point, the court emphasized that "FSAs may precede the field office's decision in a particular taxpayer's case, [but] they do not precede the decision regarding the agency's legal position." *Id.* In other words, the Court stressed that working law need be final only on the legal question presented, not on a policy question, let alone on every policy question possibly implicated.

Several years later, in *Tax Analysts II*, this Court extended its decision in *Tax Analysts I* to the IRS's "Technical Assistance" memoranda issued to program managers, because they reflected the Office of Chief Counsel's "considered legal conclusions." 294 F.3d at 73. Again, two points warrant emphasis. First, the Court held that the memoranda at issue constituted working law even though they did not direct final policy determinations: "It is not necessary that the [memos] reflect the final *programmatic* decisions of the program officers who request them. It is enough that they represent [the Office of Chief Counsel's] final *legal* position." *Id.* at 81. Second, in reaching its decision, the Court distinguished between different types of IRS memoranda as well as different contexts in which otherwise identical documents might circulate. This required the Court to carefully examine the role each type of memorandum played within the agency and, importantly, the direction in which each flowed. Some IRS memoranda "travel[ed] upward . . . to the Commissioner of Internal Revenue," and thus were potentially subject to revision

or rejection by a higher interpretive authority. *Id.* (emphasis omitted). But the memoranda the Court ordered disclosed "travel[ed] horizontally," *id.*, from a body with interpretive authority to a body charged with making conforming policy.

These precedents span decades and show the Court's consistent application of the working-law doctrine based upon the five characteristics enumerated above. They also reflect a principle that is especially relevant here: that authoritative legal positions may be working law even if they do not dictate any specific policy decision.

## B.    The OLC's formal written opinions have the force and effect of law.

The OLC's formal written opinions typically exhibit all the characteristics of working law.

### 1.    They are binding.

First, the OLC's written opinions are binding, conclusive on the executive branch as a whole. Since 1789, the attorney general has been charged by statute with offering legal opinions to the executive departments, and the Judiciary Act as amended still obligates the attorney general to render opinions when requested by the heads of those agencies. 28 U.S.C. § 512. As Attorney General Caleb Cushing described as early as 1854, opinions issued under this authority "officially define the law" and are "final and conclusive"; indeed, they have long "constitute[d] a body of legal precedents and exposition, having authority the same in kind, if not

10

the same in degree, with decisions of the courts of justice." Office and Duties of the Attorney General, 6 Op. Att'y Gen. 326, 334 (1854).[5] In 1933, the Attorney General delegated this function to the office that would, in 1953, become the present-day OLC.[6] Beginning in 1977 under the direction of President Carter's attorney general, Griffin Bell, the OLC took on the form in which it persists today.[7] Responding to the "rise of agency general counsels,"[8] throughout the executive branch, Attorney General Bell sought to establish the OLC as "a centralized and singular voice of Executive Branch legality."[9] To that end, Bell increased the volume of the OLC's opinion writing and "directed [the] OLC to compile and begin to publish select opinions."[10] These and other efforts cemented Bell's vision of the OLC, in its exercise of the attorney general's opinion-writing function, "as a singular legal expositor,"[11] charged with the "unique role of . . . issuing legal opinions for the Executive Branch as a whole."[12]

---

[5] *See* Daphna Renan, *The Law Presidents Make*, 103 Va. L. Rev. 805, 815 & nn.24, 27 (2017) (citing and discussing Attorney General Cushing's dominant explanation of the opinion-writing function).

[6] *Id.* at 819.

[7] *Id.* at 819–30.

[8] *Id.* at 819–20.

[9] *Id.* at 821.

[10] *Id.* at 819–20.

[11] *Id.* at 822.

[12] *Id.* at 824.

Today, the OLC's formal written opinions continue to establish the binding law of the executive branch. As the OLC itself acknowledges, it issues those opinions to "provide controlling advice to Executive Branch officials,"[13] and the opinions are, in fact, "customarily treated as . . . authoritative interpretation[s] of the law within the Executive Branch."[14] According to now–Judge Moss, executive branch agencies have treated the formal written opinions of the OLC and its predecessors "as conclusive and binding since at least the time of Attorney General William Wirt," who served from 1817 to 1829.[15] Many other former OLC lawyers have confirmed that the OLC's formal written opinions constitute the controlling legal views of the executive branch.[16]

---

[13] Barron Memo at 1 (JA 17); Memorandum from Steven Bradbury, Principal Deputy Assistant Att'y Gen., to Att'ys of the Office of Legal Counsel at 1 (May 16, 2005), https://www.justice.gov/sites/default/files/pages/attachments/2014/07/11/olc-best-practices-2005.pdf [https://perma.cc/GNU6-DKKU] ("OLC opinions are controlling on questions of law within the Executive Branch.").

[14] OLC Response Letter at 3, *Campaign for Accountability v. Dep't of Justice*, No. 1:16-CV-01068-KBJ (D.D.C. Jan. 2, 2018), ECF No. 27-1.

[15] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1320 (2000).

[16] Trevor Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448, 1464 (2010) (noting that the OLC's opinions are "treated as binding within the Executive Branch until withdrawn or overruled"); Renan, *supra* note 5, at 816 ("OLC's opinions are distinctly authoritative inside the executive branch"); McGinnis, *supra* note 4, at 376; Nelson Lund, *Rational Choice at the Office of Legal Counsel*, 15 Cardozo L. Rev. 437, 466 (1993) (OLC attorney–advisor from 1986 to 1987 noting that "Department of Justice legal opinions are generally treated as binding throughout the executive department"); *see also* Moss, *supra* note 15, at 1305 (noting that the OLC's "formal, written opinions, constitute[] the

To preserve this "longstanding and robust" tradition, the OLC "generally refus[es] to provide advice if there is any doubt about whether the requesting entity will follow it."[17] When asked for formal written opinions by independent agencies, for example, the OLC's practice is to issue an opinion "only if [the OLC] has received in writing from that agency an agreement that it will conform its conduct to [the OLC's] conclusion."[18] In short, as one former OLC lawyer and current Harvard Law School professor has observed in recent scholarship, the "OLC creates the binding law of the executive."[19] An agency that attempted to depart from the OLC's holdings "would be indulging in a futile gesture[, and s]uch gestures are never in fact made." *Schlefer*, 702 F.3d at 241.[20]

## 2.     They form a system of precedent.

Second, the OLC's opinions are intended to—and in fact do—constitute a uniform system of executive-branch precedent, as any number of former OLC

---

legal position of the executive branch"); *id.* at 1318 (noting that that "although the heads of departments are not generally required to seek legal guidance from the Department of Justice, when they do so, it is understood that the opinion provided will become the controlling view of the executive branch").

[17] Morrison, *supra* note 16, at 1464.

[18] Barron Memo at 3 (JA 19).

[19] Renan, *supra* note 5, at 816.

[20] *See also* Moss, *supra* note 15, at 1320 (noting that, due to agencies' unfailing compliance with the conclusions expressed in formal Attorney General and OLC opinions, "we have been able to go over two hundred years without conclusively determining whether the law demands adherence to [them]").

attorneys have explained.[21] In keeping with this approach, the OLC cites its previous decisions in resolving present cases; it does "not lightly depart" from those judgments; and it reconsiders them, under a policy akin to *stare decisis*, only "in appropriate cases and through appropriate processes."[22]

The OLC observes strict procedures to preserve the integrity of its system of precedent. For instance, much as the federal courts insist on the presence of a case or controversy to avoid issuing advisory opinions, the OLC generally does not provide "abstract legal opinions" or "general survey[s]" of the law; it does not offer "unnecessary advice, such as where it appears that policymakers are likely to move in a different direction"; and it typically refuses requests for formal written opinions "on questions likely to arise in pending or imminent litigation."[23] Moreover, before accepting a request for a formal written opinion, the OLC typically requires the soliciting agency to submit a "detailed memorandum setting forth the agency's own analysis of the question."[24] If the request concerns an interagency dispute, the OLC "will ask each side for a memorandum" and allow

---

[21] *See, e.g.*, Morrison, *supra* note 16, at 1464 (noting that OLC opinions bind until "withdrawn or overruled"); Barron Memo at 2 (JA 18) (describing OLC's opinions as a "system of precedent").

[22] Barron Memo at 2 (JA 18).

[23] *Id.* at 3 (JA 19).

[24] *Id.*

each side to "reply" to the other.[25] Even when there is no manifest dispute between agencies, the OLC "will also solicit the views of other agencies not directly involved in the opinion request that have subject-matter expertise or a special interest in the question presented."[26] The OLC subjects drafts of its formal written opinions to "rigorous review,"[27] and once it finalizes an opinion, it prints the opinion on bond paper for signature and, if the opinion is unclassified, catalogs it in an electronic database and in its "unclassified Day Books."[28]

### 3. They flow downward.

Third, the OLC's formal written opinions flow downward. Like the opinions at issue in *Coastal States*, *Tax Analysts I*, and *Tax Analysts II*, the OLC's formal written opinions flow from the body charged with interpreting the law to those charged with implementing it. The OLC's role is, of course, distinct, in that it issues its formal written opinions to other agencies. But this reflects the uniquely preeminent role of the OLC's legal interpretations. The OLC has been delegated the authority—originally vested in the attorney general—to issue legal interpretations that bind the executive as a whole.

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

The OLC is in effect the "Supreme Court of the executive branch,"[29] and its formal written opinions flow downward to and control executive agencies in the same way that the Supreme Court's opinions do. Although the OLC's opinions may be displaced by judicial rulings, they are frequently sought on issues "unlikely to be resolved by the courts,"[30] and so the OLC's opinions frequently are "the final word on the controlling law."[31] One particularly striking consequence of the preeminence of the OLC's formal written opinions is that a determination by the OLC that particular conduct does not violate federal criminal law has the effect of immunizing federal officials from prosecution for engaging in that conduct.[32]

The hierarchical relationship between the OLC and the agencies soliciting its formal written opinions is not significantly different than the relationship between federal courts and federal agencies. Like decisions of a court, the OLC's formal

---

[29] *See* PBS NewsHour, *supra* note 3 (quoting Jeh Johnson, former Secretary of the Department of Homeland Security).

[30] Barron Memo at 1 (JA 17).

[31] *Id.*

[32] *See* Renan, *supra* note 5, at 832 & n.117 (describing effective immunity OLC opinions conferred on those who tortured prisoners); Jack Goldsmith, The Terror Presidency: Law and Judgment Inside the Bush Administration 162 (2007) (former head of the OLC describing the OLC opinions authorizing the Central Intelligence Agency's "enhanced interrogation techniques" as a "golden shield" from prosecution).

written opinions "ha[ve] real operative effect absent appeal." *Coastal States*, 617

F.2d at 867.[33]

### 4.    They are solicited and issued to guide future agency conduct.

Fourth, the OLC's formal opinions are typically forward-looking, in that

they are solicited and issued to guide future agency conduct. The OLC's internal

guide makes clear that formal written opinions "should address legal questions

prospectively," and that the "OLC avoids opining on the legality of past

conduct."[34] And, as explained above, the OLC generally does not provide "abstract

legal opinions," "general survey[s]" of the law, or "unnecessary advice, such as

where it appears that policymakers are likely to move in a different direction."[35]

Instead, the OLC generally insists that there be a "practical need" for its formal

written opinions, such as where there is "a concrete and ongoing dispute between

two or more executive agencies."[36] These constraints limit the OLC's issuance of

formal written opinions to those that will in fact guide agency conduct in the

future.

---

[33] Some formal written opinions of the OLC travel upward to the president and, for that reason, generally are not working law. *Tax Analysts I*, 294 F.3d at 81 (noting that an opinion traveling upward generally would not be working law).

[34] Barron Memo at 3 (JA 19).

[35] *Id.*

[36] *Id.*

### 5.    They are written in conclusive terms.

Fifth, and finally, the OLC's formal written opinions are written in conclusive terms. This is evident from even a cursory review of some of the hundreds of formal written opinions the OLC has published.[37] The opening paragraphs of the OLC's formal written opinions usually describe the legal questions presented in much the same way as judicial opinions do. Their final paragraphs generally announce their resolution of the question presented and their

---

[37] The OLC publishes some of its formal written opinions in an online reading room. *See* Opinions, Office of Legal Counsel, https://www.justice.gov/olc/opinions (last visited Aug. 12, 2018). Here are several examples of the many that exhibit a conclusive tone:

*Permissibility of Small Business Administration Regulations Implementing the Historically Underutilized Business Zone, 8(A) Business Development, and Service-Disabled Veteran-Owned Small Business Concern Programs* (2009), https://www.justice.gov/file/18471/download [https://perma.cc/6TVM-TTNQ];

*The Authority of the Equal Employment Opportunity Commission To Order a Federal Agency To Pay a Monetary Award To Remedy a Breach of a Settlement Agreement*, (2008), https://www.justice.gov/opinion/file/833591/download [https://perma.cc/5YX2-TX24];

*Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act* (2007), https://www.justice.gov/file/451616/download [https://perma.cc/8TW4-UX8D];

*Responsibility of Agencies to Pay Attorney's Fee Awards Under the Equal Access to Justice Act* (2007), https://www.justice.gov/file/451596/download [https://perma.cc/9DVV-R5S6]; and

*Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply With Orders Issued by EEOC Administrative Judges* (2003), https://www.justice.gov/file/18906/download [https://perma.cc/S3YB-CZEH].

legal conclusions in much the same manner as do the final paragraphs of many judicial opinions. The legal analysis within each opinion is grounded in the OLC's own precedents. And the opinions state their legal conclusions in mandatory language. They do not equivocate or confine themselves to presenting the advantages and disadvantages of a particular legal interpretation. Instead, they conclusively resolve concrete questions about the executive branch's legal authorities and obligations. These are the characteristics of working law. *See, e.g.*, *Tax Analysts II*, 294 F.3d at 81 (upholding disclosure of documents that used terms "should" and "[w]e conclude"); *Schlefer*, 702 F.2d at 237 (relying on "tone" of documents and use of terms such as "held").

*   *   *

The OLC's formal written opinions exhibit all the characteristics of working law, and they are in fact the quintessential examples of it. In issuing formal written opinions, the OLC is not a legal advisor but a legal arbiter.

### C.   The Court's decision in *EFF* is not to the contrary, because the OLC memorandum at issue in that case was backward-looking and offered policy advice on a retrospective investigation.

The district court interpreted this Court's decision in *EFF* as foreclosing the argument that the OLC's formal written opinions constitute working law. *See Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice* (*CREW*), 298 F. Supp. 3d 151, 154–55 (D.D.C. 2018). The court was incorrect for two reasons.

19

First, *EFF* is factually distinct because the OLC memorandum at issue in that case did not exhibit one of the key characteristics of working law. Specifically, the memorandum was *backward*-looking, not forward-looking, in that it concerned only past conduct and was not intended to lay a legal foundation for future conduct. The Federal Bureau of Investigation ("FBI") solicited the memorandum in determining how to respond to an inspector-general investigation of a practice that the Bureau had abandoned years earlier. *EFF*, 739 F.3d at 4. That is, the FBI did not request a conclusive legal ruling meant to provide a foundation for ongoing or future conduct; rather, it sought legal advice to help it respond to an inquest into conduct it had already halted. *Id.* at 5. According to this Court, the memorandum at issue offered policy advice rather than a statement of the executive branch's legal position. *Id.* at 10 ("It merely examine[d] policy options available to the FBI.").

In other words, the OLC memorandum at issue in *EFF* was, effectively, an advisory memorandum addressing a moot case. This kind of backward-looking advice is much more likely to be deliberative. An agency seeks backward-looking guidance not to establish the rules of the road that will govern its conduct going forward, but to defend past practices, reflect on lessons learned, or prepare for defensive litigation.

By contrast, the OLC's formal written opinions are generally *forward*-looking. As explained above, *see* Part I.B.4, their principal purpose is to set out

20

binding legal interpretations to govern future conduct. Whereas legal determinations meant to guide future agency conduct may constitute working law because they govern the conduct of the executive branch going forward, legal advice concerning only past conduct is more likely to be deliberative.

Second, interpreting *EFF* as the district court did creates a conflict with this Court's prior precedent. This Court has repeatedly held that legal interpretations may constitute working law even if they do not dictate specific policy decisions. *See* Part I.A. *EFF* could not have reversed this rule. Nevertheless, the district court appears to have interpreted *EFF* as having done just that, in reasoning that "the D.C. Circuit concluded that the OLC's opinion constituted mere legal advice, thus fitting squarely within the deliberative process exemption." *CREW*, 298 F. Supp. 3d at 155.

To be sure, the district court's reasoning is not entirely clear. It may have interpreted *EFF* as having held that OLC opinions cannot constitute working law because the OLC is independent from the agencies that solicit its advice. *See, e.g.*, *id.* at 155 ("In short, 'OLC is not authorized to make decisions about the FBI's investigative policy . . . .'" (quoting *EFF*, 739 F.3d at 9)). The OLC's independence is irrelevant, however, because the OLC's formal written opinions are the law of the executive branch *as a whole*. *See* Part I.B.1. Again, the explicit function of the OLC's formal written opinions is to standardize legal interpretation

21

across executive agencies. In issuing those opinions, the OLC is "a singular legal

expositor," with the "unique role of . . . issuing legal opinions for the executive

branch as a whole."[38] Indeed, the OLC's formal written opinions supersede those

of an agency's general counsel and even those of an agency's head. The OLC sits,

in a sense, as an appellate review board. Its opinions are preeminent and

necessarily reflect the law of every agency.

It is therefore immaterial that the OLC is technically independent. Moreover,

in a case predating *EFF*, this Court held that legal opinions issued by one

executive-branch entity may constitute the working law of another, independent

entity. In *Tax Analysts I*, the Court held that certain memoranda issued by the

Office of Chief Counsel constituted the working law of the IRS. *Tax Analysts I*,

117 F.3d 607. But, as the Court noted in its opinion, the Office of Chief Counsel

"understands itself as independent from the IRS." *Id.* at 609. The IRS and Office of

Chief Counsel are both components of the Department of the Treasury, but the

Office "has an independent statutory mandate." Brief for Tax Analysts at *6–7,

*Tax Analysts I*, 117 F.3d 607 (D.C. Cir. 1997) (Nos. 96–5152, 96–5241), *available

at* 1996 WL 34482862. And if the Office of Chief Counsel and the head of the IRS

"disagree on a legal matter, the dispute is resolved by the Secretary or Deputy

Secretary of the Treasury." *Id.* Notwithstanding the independent relationship

---

[38] Renan, *supra* note 5, at 822, 824.

between the IRS and the Office of Chief Counsel, this Court held that certain of the Office's memoranda constituted working law because they were routinely "relied upon" and issued in an attempt "to develop a body of coherent, consistent interpretations of the federal tax laws nationwide." *Tax Analysts I*, 117 F.3d at 617.

There is no tension, then, between *EFF* and the proposition that the OLC's formal written opinions are typically working law. The memorandum at issue in *EFF* did not have the features of working law, but most of the OLC's formal written opinions do.

### D.      The OLC's formal written opinions are generally not exempt from disclosure pursuant to the attorney–client privilege.

The district court also held that the OLC's formal written opinions are protected under Exemption 5 by the attorney–client privilege, *CREW*, 298 F. Supp. 3d at 155–56, but this holding misapprehends the relationship between the OLC and the agencies soliciting formal written opinions. As an initial matter, this Court has made clear that "the attorney–client privilege may not be used to protect [working law] from disclosure to the public." *Tax Analysts I*, 117 F.3d at 619. More fundamentally, however, the OLC's relationship with the agencies that seek its formal written opinions is not an attorney–client relationship.

To begin, the OLC's obligation is not to the agencies soliciting its formal written opinions, but to the promotion of a uniform understanding of law

23

throughout the executive branch.[39] So, for example, the OLC might reject one plausible interpretation of law even if it would advance the interests of a supposed "client" agency, to ensure uniformity with interpretations provided to other agencies. Relatedly, unlike in virtually every other attorney–client relationship, the OLC is not bound to respect the confidentiality of its "clients." The OLC "operates from the presumption that it should make its significant opinions fully and promptly available to the public."[40] And, beyond that, Barron's memo makes clear that the OLC—and the OLC alone—makes the ultimate determination of whether to publish its formal written opinions.[41] By contrast, clients in an actual attorney–client relationship "own" the privilege and have ultimate say over the disclosure of their confidences. *See, e.g.*, *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984) (noting that "the privilege is held by clients"). Indeed, lawyers in an attorney–client relationship have an ethical obligation to protect their client's confidences.

There are many other ways in which the OLC acts inconsistently with its claim of privilege. It routinely cites legal determinations made in one formal written opinion in other formal written opinions, even though doing so exposes

---

[39] Barron Memo at 1 (JA 17).

[40] *Id.* at 5 (JA 21).

[41] *Id.* at 5–6 (JA 21–22).

supposedly confidential information in one opinion to the requesters of the other (and to the public as well, if the opinion is released). *See* Part I.B.2. It routinely adjudicates disputes between two agencies whose interests are adverse, during which time it shares supposed confidences between the adverse agencies and "advises" adverse parties at the same time on the subject matter of their ongoing dispute. *See* Barron Memo at 3 (JA 19). And it expects its "clients" to be bound by its past legal determinations unless it overrules them. *See* Part I.B.1.

In short, in issuing formal written opinions, the OLC is an arbiter, not an advocate, and it would stretch the attorney–client privilege beyond recognition to apply it here.

## II.    Even under a broad reading of *EFF*, certain subcategories of the OLC's formal written opinions are working law because they determine agency policy.

In granting the government's motion to dismiss, the district court offered CREW the opportunity to "amend[] its complaint to allege that some specific *subset* of OLC's formal, written opinions are being unlawfully withheld." *CREW*, 298 F. Supp. 3d at 156 (emphasis added). CREW did not do so. In separate litigation raising related issues, however, Campaign for Accountability (amicus here) amended its complaint when presented with the same choice. *See Campaign for Accountability*, 278 F. Supp. 3d at 324 ("[T]he Court will permit CfA to amend its complaint to add allegations of specific, ascertainable categories of [OLC]

25

records that CfA believes are subject to the reading-room requirement . . . .”). That litigation, which is ongoing, is now focused on the question of whether certain subcategories of the OLC’s formal written opinions constitute working law, even accepting what amici here argue is an unjustifiably broad interpretation of *EFF*.[42]

As Campaign for Accountability has explained in its briefing in that ongoing litigation, certain subcategories of the OLC’s formal written opinions directly determine agency policy by resolving legal disputes that leave an agency no choice in what policy to pursue.

This appeal does not present the question of whether these subcategories constitute working law. Amici point to them, however, to show that, even under the broadest reading of *EFF*, the district court erred in ruling that the OLC’s formal written opinions can never be working law.

## CONCLUSION

For these reasons, this Court should reverse the judgment of the district court and remand for further proceedings.

---

[42] Specifically, Campaign for Accountability contends that at least four subcategories of the OLC’s formal written opinions constitute working law because they directly determine agency policy: (1) opinions resolving interagency disputes, (2) opinions interpreting non-discretionary legal obligations, (3) opinions finding that particular statutes are unconstitutional and that therefore agencies need not comply with them, and (4) opinions adjudicating or determining individual rights. *See* Plaintiff’s Opposition to Government’s Renewed Motion to Dismiss at 30–42, *Campaign for Accountability v. Dep’t of Justice*, No. 1:16-CV-01068-KBJ (D.D.C. Mar. 6, 2018), ECF No. 30.

Respectfully submitted,

 /s/ Jameel Jaffer
Jameel Jaffer
Alex Abdo
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
alex.abdo@knightcolumbia.org

*Counsel for Amici Curiae*

August 15, 2018

## RULE 32(G)(1) CERTIFICATE

The undersigned certifies that this brief complies with type-volume and typeface requirements of the Federal Rules of Appellate Procedure in that it contains 6,190 words and is set in a plain, roman style in 14-point font.


/s/ Jameel Jaffer
Jameel Jaffer
Counsel for Amici Curiae

## CERTIFICATE OF SERVICE

I certify that on August 15, 2018, I caused this Brief of Amici Curiae to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Bradley Hinshelwood
Michael S. Raab
U.S. Department of Justice
950 Pennsylvania Avenue, NW, Room 1264
Washington, DC 20530
Bradley.A.Hinshelwood@usdoj.gov

*Counsel for Appellee*

Anne L. Weismann
Citizens for Responsibility and Ethics in Washington
455 Massachusetts Avenue, NW
Washington, DC 20001
aweismann@citizensforethics.org

*Counsel for Appellant*


/s/ Jameel Jaffer
Jameel Jaffer
Counsel for Amici Curiae

29